E-FILED
Thursday, 19 September, 2019  04:54:13 PM
Clerk, U.S. District Court, ILCD

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

FILED
SEP 19 2019
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. 19-MJ-7196
 )
Apple iPhone currently in FBI evidence storage under )
evidence number E646123 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Central_____ District of _____Illinois_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sect. 846 | Conspiracy to possess with the intent to distribute controlled substance. |

See attached affidavit for additional "target offenses."

The application is based on these facts:

See the affidavit of FBI TFO Chad Ramey, which is attached hereto and specifically incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Chad Ramey
_____
Applicant's signature

FBI TFO Chad Ramey
_____
Printed name and title

Sworn to before me and signed in my presence.

s/Eric I Long

Date: 09/19/2019                         _____
                                         Judge's signature

City and state: Urbana, Illinois        Hon. Eric I. Long, U.S. Magistrate Judge
                                         Printed name and title

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, Chad Ramey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been a police officer for the Decatur Police Department, Decatur, Illinois for twenty-four (24) years. For the past twenty (20) years, I have been assigned to the Decatur Police Department Street Crimes Unit. I am also assigned as a Task Force Officer with the Federal Bureau of Investigation, assigned to the Eastern Illinois Violent Criminal Enterprise and Drug Trafficking Organization Task Force. I am assigned to investigate complex criminal enterprises, including Drug Trafficking Organizations (DTO). I have participated in narcotics investigations involving the manufacture, transportation, and distribution of controlled substances. These investigations have resulted in the seizure of controlled substances and proceeds from the sale of controlled substances, as well as arrests and convictions of drug traffickers. I am familiar with, and have utilized, normal methods of investigation, including, but not limited to physical and electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, analysis of telephone records, and the utilization of undercover agents.

2. I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show merely that there is

sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## PROPERTY TO BE SEARCHED & REQUESTED AUTHORIZATION

3. The property to be searched is a cellular phone recovered during the July 11, 2019, execution of the arrest warrant for GABRIELLE JOHNSON authorized by U.S. District Courts for the Central District of Illinois. The cellular phone is further described as follows: **Apple iPhone currently in FBI evidence storage under evidence number E646123 (hereinafter, the "Device").**

4. **Requested Action:** I make this affidavit in support of an application for a search warrant authorizing the search of the property identified above and as set forth in and for the seizure of the items specified in Attachment B, which items constitute instrumentalities, fruits, and evidence of violations of Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute and Distribution of a Controlled Substance); Title 21, United States Code, Section 843(b) (Unlawful Use of a Communication Facility); Title 21, United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute and Distribution of a Controlled Substance); Title 21, United States Code, Section 848 (Engaging in a Continuing Criminal Enterprise); Title 18, United States Code, Section 1952 (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises); and Title 18, United States Code, Section 1956 (Money Laundering) (hereinafter referred to as "target offenses"). There is also probable cause to believe that information and items described in Attachment B will constitute evidence of

this criminal violation and will lead to the identification of additional individuals who are engaged in the commission of this offense.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## INCORPORATION BY REFERENCE OF PRIOR AFFIDAVITS

6. On July 3, 2019, the United States District Court for the Central District of Illinois issued a complaint and arrest warrant for GABRIELLE Johnson in case number 19-MJ-7133, supported by the sworn affidavit of FBI Special Agent Mark Hill. The contents of that affidavit are incorporated herein by reference.

7. Included within the affidavit in support of the criminal complaint was the following information specific to GABRIELLE Johnson:

   a. On May 10, 2019, COURTNEY JOHNSON (hereinafter, "JOHNSON") received a text message from a supplier of marijuana with the following message:

   > New Total
   > 51aaa@1750
   > 12aaa@17
   > 2aa@1650
   > 20a+@1450
   > 33dog@1350
   > 2og@1150
   > 16animalcook@1250
   > 12sherb@1250

3

b. Based on their training and experience investigating drug traffickers, agents believe that the message above is a price listing for an order of varying strains of cannabis. The number to the left represents a quantity in pounds, the characters in the middle identify the strain of cannabis, and the "@" symbol followed by a number identifies the per-pound price of that quantity of cannabis. For example, this order include 16 lbs. of "animal cook" cannabis for $1,250 per pound. JOHNSON's marijuana order outlined above is for more than 100 lbs.

c. On April 13, 2019, JOHNSON confirmed with the supplier that he arranged to pay "226", meaning that JOHNSON ordered $226,000 worth of marijuana. During a phone call with the supplier on April 13, 2019, JOHNSON asked the individual coordinating payment what is a good time for him tomorrow (meaning April 14, 2019), to which the unknown male replied any time after 1:00 p.m. Later on April 13, 2019, the individual coordinating payment provided JOHNSON with an address for a grocery store in Chicago, Illinois.

d. A snowstorm came through northern Illinois and Wisconsin on April 14, 2019. In a series of four text messages sent from the individual coordinating payment to JOHNSON's cellular phone number at approximately 2:49 p.m., the individual coordinating payment conveyed the following: "[1/4] I was on a flight to Chicago this

morning that got redirected to Tulsa Oklahoma due to weather conditions. The pilot said best case scenario we will be la[2/4]nding around 5pm. We've been sitting on the tarmac for 30 min and are hoping to take off soon…My home girl Debrah(same girl as last time) can meet y[3/4]our buddy at 5 pm for me. She can handle this no problem. Or you friend can wait for me which prob won't be till at least 6pm. Let me know what you wan[4/4]t to do? If your cool with her handling it, I'd like to give Debrah your number so she can coordinate better because I'll be in the air." Thereafter, JOHNSON received a call from an unknown female. JOHNSON told the female that they will call her when "they like 45 minutes away."

e. During the afternoon on April 14, 2019, FBI in Chicago conducted surveillance on the Mariano's parking garage. At approximately 5:00 p.m., GABRIELLE Johnson, drove her black Dodge Challenger to Mariano's in Chicago, Illinois. Once parked, another female entered GABRIELLE Johnson's Dodge Challenger. After approximately two minutes, the trunk to the Dodge Challenger opened and the female exited, removed a suitcase out of the trunk of GABRIELLE Johnson's Challenger, placed it in the trunk of the female's vehicle, and drove away.

f. Immediately after that encounter, GABRIELLE Johnson left Chicago and drove back to the Central District of Illinois.

g. On April 15, 2019, at approximately 10:57 a.m., JOHNSON sent a text message to supplier that stated, "Yo so I just leave the crib that's only 200 she forgot the lil one but I can mail or or I'll be out next week on Tuesday." Based on these exchanges and the surveillance operation, agents believe that JOHNSON agreed to pay approximately $226,000 for the quantities of various types of marijuana as set forth in the April 10, 2019, price list. Approximately $200,000 of that payment was made by GABRIELLE Johnson on April 14, 2019, in Chicago. JOHNSON had to make arrangements for the remaining $26,000.

**FACTS ESTABLISHING PROBABLE CAUSE FOR THE SEARCH OF THE DEVICE**

8. Between March 13, 2019, and May 8, 2019, outgoing and incoming voice calls from one of JOHNSON's known telephone numbers 217-836-9012 were intercepted and monitored. Text messages and communications over messaging applications were not monitored during that time. During that time, JOHNSON called telephone number 217-520-3630, which is a telephone number associated with GABRIELLE Johnson.

9. During these intercepted and monitored voice calls, JOHNSON and GABRIELLE Johnson would frequently discuss routine family matters. For example, on March 23, 2019, JOHNSON called telephone number 217-520-3630 and asked the female receiving the call where "mom" was. JOHNSON and GABRIELLE Johnson are both the

children of Jennifer Fisher. In response, GABRIELLE Johnson told JOHNSON that their mom was with GABRIELLE Johnson.

10. The last day GABRIELLE Johnson and JOHNSON communicated over voice call prior to GABRIELLE Johnson's April 14, 2019, trip to Chicago to deliver the $200,000 payment was April 8, 2019. On April 8, 2019, at approximately 12:31 p.m., JOHNSON called GABRIELLE Johnson and told GABRIELLE Johnson that he planned to retrieve a house key for Jennifer Fisher's home. JOHNSON ended the call by instructing GABRIELLE Johnson to "text" JOHNSON and he was going to come over.

11. JOHNSON's instruction to GABRIELLE Johnson to "text" him, indicates that GABRIELLE Johnson and JOHNSON communicated via text message during the time of JOHNSON's April and May 2019 purchase of marijuana. The substance of those text messages were not intercepted and monitored, unlike the voice calls.

12. Further, after JOHNSON was notified on April 14, 2019, that the meet-up time would be 5:00 p.m., JOHNSON receive a call from an unknown female at approximately 3:01 p.m. as indicated from the source of marijuana who arranged the payment and delivery. JOHNSON told the female that he would "have them call you when they like 45 minutes away." Thereafter, GABRIELLE Johnson arrived in Chicago to meet with a female in a grocery store parking lot and transfer luggage from GABRIELLE Johnson's car to the female's car. No voice calls from JOHNSON's two known phone numbers to GABRIELLE Johnson's phone number were intercepted and monitored between April 8, 2019, and April 14, 2019, when GABRIELLE Johnson arrived

7

at the agreed meeting time and place. The absence of voice calls in spite of this coordination suggests that GABRIELLE Johnson and JOHNSON communicated through text messaging or other cellular messaging services in order to further their drug trafficking.

13. On July 11, 2019, agents executed the arrest warrant for GABRIELLE Johnson at her home located at 120 S. Center Street, Unit #300, in Collinsville, Illinois.

14. At approximately 6:45 a.m., agents of the FBI knocked on the door of 120 S. Center Street, Unit #300, in Collinsville, Illinois, and announced something to the effect of "FBI. Come to the door." That knock and loud announcement was repeated twice more with approximately 15 to 20 seconds between each repetition. No one answered the door within one minute. Thereafter, agents used a ram to force the door open.

15. Immediately upon entry into the apartment, agents observed GABRIELLE Johnson standing in the entryway holding the Device in her hand. Agents ordered GABRIELLE Johnson to put down the Device, which she did. The Device was recovered as part of GABRIELLE Johnson's personal property and stored in FBI evidence storage under evidence number E646123. Agents then handcuffed GABRIELLE Johnson and placed her under arrest.

16. After her arrest, FBI agents advised GABRIELLE Johnson of her Miranda rights, and she agreed to speak with agents. During that interview, GABRIELLE Johnson stated the following:

a. GABRIELLE Johnson was aware that JOHNSON was involved in selling illegal drugs, particularly marijuana, for at least a few years.

b. GABRIELLE Johnson had done favors for JOHNSON in the past, which involved delivering packages or items to various locations on JOHNSON's behalf. GABRIELLE Johnson believed that the packages contained money. GABRIELLE Johnson estimated that she made deliveries for JOHNSON between 10 and 15 times. During these deliveries, GABRIELLE Johnson did not know the individuals with whom she met and generally did not engage in much conversation with those individuals.

c. GABRIELLE Johnson admitted to taking a suitcase to Chicago on April 14, 2019, at JOHNSON's request. Although she did not look into the suitcase she delivered, GABRIELLE Johnson assumed it was money.

## BACKGROUND REGARDING
## DRUG TRAFFICKING ACTIVITIES & CELLULAR PHONE USE

17. My representations in the following paragraph and its subparagraphs are based on my and other agents/detective's education, training, and experience pertaining to the methods and techniques used by drug traffickers in furtherance of their drug trafficking activities.

18. Based on this training and experience I know that:

a. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, travel documents, receipts relating to the purchase of financial instruments and or transportation, ordering, sale and distribution of controlled

9

substances. Such records are usually kept where the traffickers have ready access to them, including electronic records stored in cellular devices, and they are often kept for extended periods of time;

b. It is common for large scale drug traffickers to maintain evidence regarding their obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, including currency, financial records, financial instruments, jewelry and precious metals, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, safe-deposit box keys, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, and money wrappers. These items are often maintained in traffickers' residences and other locations over which they exercise dominion and control, including electronic records stored in cellular devices, and they are often maintained for an extended period of time;

c. When drug traffickers amass significant proceeds from the sale and distribution of narcotics they often attempt to dissociate their assets from the source of their illegal activities through various money laundering activities. To accomplish these goals, drug traffickers use various means, including but not limited to domestic and international banks and their associated financial services, securities brokers, professional services from attorneys, accountants and financial consultants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

d. Drug traffickers commonly maintain addresses or telephone numbers in books, papers, cellular telephone memory and/or cellular telephone memory cards which reflect names, addresses, and or telephone numbers for associates and customers;

e. Drug traffickers often take or cause to be taken photographs and other visual depictions of themselves, their associates, their property, and their product, and typically keep and maintain these photographs for extended time periods in their residences and other locations where they exercise dominion and control;

f. Large scale traffickers often use electronic devices, including computers, cellular telephones, electronic diaries, currency counting machines and cellular telephone answering machines to generate, transfer, count, record and or store information pertaining to the items described above and or to maintain contact with drug associates;

g. When drug traffickers use a device such as those referred to in this affidavit as an electronic device and or cellular phone in connection with drug trafficking, along with maintaining contact with drug associates, the devices will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. I believe that a device used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of communications between parties to the crime; and other records that indicate the nature of the offense. Electronic devices have files and said files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

h. Wholly apart from user-generated files, electronic devices' storage media—in particular, devices' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Electronic device users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

## TECHNICAL TERMS

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS

antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20. Based on my training, experience, and research, I believe that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, and a GPS device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   c. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ

techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

24. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### INVESTIGATION SINCE JULY 11, 2019

25. The investigation of the JOHNSON DTO is led by the undersigned and FBI Special Agent Mark Hill, both of whom have additional professional obligations beyond investigating the JOHNSON DTO. On July 11, 2019, four individuals were arrested on complaints in relation to their respective roles in the JOHNSON DTO. JOHNSON was not located on July 11, 2019, despite agents' best efforts. Additional investigative steps were needed with respect to those arrested individuals in preparation of indictment in order to comply with the time constraints of the Speedy Trial Act. Further, agents continued to investigate the location of JOHNSON, who remains at large. As a result of these demands, a warrant for the search of these cellular phones was difficult to prepare until now.

## CONCLUSION

26.    I submit that this affidavit supports probable cause for search warrants authorizing the examination of the Device, as described in Attachment A, to seek the items described in Attachment B.

Respectfully submitted,
s/Chad Ramey

Chad Ramey
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on September 19, 2019
s/Eric I Long

Hon. Eric I. Long
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
(Property to be Searched)

The property to be searched is a cellular phone recovered during the July 11, 2019, execution of the arrest warrant of GABRIELLE JOHNSON authorized by U.S. District Courts for the Central District of Illinois. The cellular phone is further described as follows: **Apple iPhone currently in FBI evidence storage under evidence number E646123 (hereinafter, the "Device")**

## ATTACHMENT B
## PROPERTY TO BE SEIZED

All records on the Device that relate to violations of 21 U.S.C. §§ 846, 841(a)(1), 843(b), and 848; as well as 18 U.S.C. §§ 1952 and 1956, including:

1. Books, records, receipts, notes, and other papers relating to the identification of co-conspirators involved in drug trafficking (indicia);

2. Photographs, including still photos, negatives, video tapes, films, electronic images, undeveloped film and the contents thereof, slides, and in particular photographs, etc., of co-conspirators, of assets;

3. Books, records receipts, notes, ledgers and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, particularly marijuana;

4. Papers, tickets, notes, receipts, and other papers relating to domestic and international travel;

5. Books, records, invoices, receipts, records of real estate transactions, tax returns, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts and cashier's checks, safe deposit keys, money wrappers and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money;

6. Address and or telephone books, rolodex indices, electronic contact records, and any papers reflecting names, addresses, telephone numbers, pager numbers, fax

numbers, email or other electronic contact information, and or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals, businesses and institutions with whom a financial relationship exists;

7. Indicia of occupancy and or residency, rental and or ownership of premises, including but not limited to utility and telephone bills, rental, purchase or lease agreements, and keys;

8. Records or receipts pertaining to the possession or purchase of firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons;

9. Assets believed to have been purchased with drug proceeds, including, but not limited to vehicles, motorcycles, precious metals, stocks, bonds, and jewelry;

10. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.